**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:23cr288** |
| | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **CHRISTOPHER ESSAMEDDIN** | : | |
| **BIRRY,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**MEMORANDUM**

Before the court is Defendant Christopher Essameddin Birry's motion to

suppress evidence.  (Doc. 26).  Following an evidentiary hearing and

supplemental briefing by the parties, Birry's motion is ripe for disposition.

**Background[1]**

On November 14, 2023, a grand jury in the Middle District of Pennsylvania

indicted Birry on drug trafficking and gun possession offenses.  (Doc. 1).  The

indictment charges defendant with:

- Counts 1-5 – distribution of a controlled substance in violation
  of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C);

---

[1] These background facts are derived from the indictment, (Doc. 1), the testimony of Evan Pratt
and Michael Shaheen of the Blakely Police Department during the suppression hearing on
September 19, 2024, (Doc. 47, Hearing Transcript ("H.T.")), and from video footage captured
by the officers' body-worn cameras ("bodycam videos"), (Doc. 27, E. Smith Decl., ¶¶ 3-4; Doc.
27-1, Exs. A ("Pratt Cam") & B ("Shaheen Cam")).  The court will address the officers'
testimony and the bodycam videos in greater detail in the analysis section of this
memorandum.

- Count 6 - possession of firearms in furtherance of a drug trafficking offense, 18 U.S.C. § 924(c)(1)(A)(i); and

- Count 7 - possession of firearms after being convicted of a crime punishable by imprisonment for a term exceeding one year, 18 U.S.C. § 922(g)(1).

(Id.)

The charges in Counts 5, 6, and 7 stem from a traffic stop, which occurred in Blakely, Lackawanna County on the afternoon of September 11, 2023.  On that date at approximately 12:30 PM, a senior patrolman of the Blakely Police Department, Evan Pratt, observed a Chrysler PT Cruiser proceed past his location on Main Street with a cracked windshield. (Doc. 47, H.T. 7:12-18, 8:10-9:8).  A database search revealed that the vehicle's registration expired six (6) years earlier. (Id. 9:5-8).

As the PT Cruiser turned toward the Borough of Olyphant, Patrolman Pratt initiated a traffic stop by activating his lights and sirens and Pratt pulled the vehicle over near a vacant auto repair shop. (Id. 9:9-9:17 (Pratt); 40:20-25 (Shaheen); Doc. 27-1; Pratt Cam 12:38:44-50).  A corporal from the department, Michael Shaheen, observed Pratt initiate the traffic stop and provided back up. (Doc. 47, H.T. 40:20-25).

Patrolman Pratt approached the passenger side where Birry was seated. Corporal Shaheen stood at the driver side. (Doc. 27-1, Pratt Cam 12:39:04–12:39:14; Shaheen Cam 12:39:16).  Pratt alerted the driver, Austin Brallier, that

2

he pulled the vehicle over for the expired registration and cracked windshield. (Pratt Cam, 12:39:14–12:39:20). In response to the patrolman's request for his drivers' license and proof of insurance, Brallier advised that he had neither. (Id. 12:39:20–12:39:57).

Complying with Patrolman Pratt's requests, Brallier stepped out of the PT Cruiser and spoke with the officer at the rear of the vehicle. (Id. 12:39:57–12:41:01). In response to the patrolman's requests, Brallier provided his name and date of birth and told the officer that the two men were headed "back to Scranton" and were coming from "the garage up there" but could not remember its name. (Id. 12:40:16–12:40:49). After the patrolman pointed toward Birry and asked, "Who's this guy in the car here?", Brallier stated that Birry was his father's friend and that he thought his name was Chris. (Id. 12:40:49–12:40:59).

Patrolman Pratt then proceeded to run Brallier's name through a database accessible on a computer in the police vehicle. (Id. 12:41:08–12:42:02). A result for Brallier indicated an active warrant and Pratt radioed to the communications center for additional inquiry into the result. (Id. 12:42:02–12:43:30). Pratt rejoined Brallier, who was now standing on the sidewalk with Corporal Shaheen. (Id. 12:43:30–38). After receiving more information from the communications center, Pratt told the center to "send the hit," i.e., obtain confirmation of the warrant. (Id. 12:43:38–12:44:14). Pratt advised Brallier of the warrant results. (Id.

3

12:44:14–17).  Pratt handcuffed Brallier due to the outstanding warrant and began a search of Brallier's person with his consent. (Id. 12:43:38-12:45:10).

As Patrolman Pratt searched Brallier, the passenger, Birry, who was holding his wallet, cigarette pack, and cellphone out of the vehicle window, engaged the attention of Corporal Shaheen from the passenger seat. (Id. 12:44:42, 12:44:50, 12:54:55; Shaheen Cam 12:44:28, 12:44:50–12:44:55). Birry asked Shaheen if he could call a cab. (Shaheen Cam 12:44:56–12:44:57). Shaheen responded, "we'll figure it out," then asked, "do you have an ID on you, brother?" (Id. 12:44:57–12:44:59).  Birry responded in the affirmative and then handed his state-issued identification card to Shaheen. (Id. 12:44:59–12:45:06). Birry advised that he did not have a driver's license. (Id. 12:45:08-12:45:11)

Corporal Shaheen directed Birry to step out of the vehicle. (Id. 12:45:37). Birry needed approximately forty (40) seconds to gather himself before he exited. (Pratt Cam 12:45:42-46:25).  On the sidewalk, Birry held a cellphone and wallet in his hands. (Shaheen Cam 12:46:33–12:46:39).  He kept moving these items toward and away from his jacket pockets. (Id. 12:46:41–12:46:46).  In response to questions from Patrolman Pratt about origin and destination, Birry said that Brallier was giving him a ride back to Wilkes-Barre. (Doc. 27-1, Pratt Cam 12:46:29–49).

4

Corporal Shaheen fixated on the movements of Birry's hands in the direction of his jacket pockets as Birry answered Pratt's questions. (Id.). Simultaneous to Birry's responses to Pratt's questions, Shaheen asked (twice) if he could search Birry. (Shaheen Cam 12:46:53–12:46:57). Birry paused briefly but answered affirmatively. [2] (Id. 12:46:57–12:47:05). During the search, Shaheen shook the sides of Birry's sweatpants near the waistband. (Pratt Cam 12:47:39–12:47:42). Shaheen testified, at that point, he observed an object drop down the leg of the defendant's sweatpants. (Doc. 47, H.T. 52:13-22). Shaheen ordered Birry to put his hands on an adjacent brick wall. (Doc. 27-1, Pratt Cam 12:47:42–12:47:46). Shaheen asked Birry about the object in his pant leg. (Id. 12:47:47). Birry responded, "What's in my pant leg, where?" (Id. 12:47:48). Shaheen ordered Birry to place his hands behind his back. (Id. 12:47:49– 12:47:52). As Patrolman Pratt moved to assist Shaheen, the defendant pushed away from the officers and attempted to flee, instantly being taken to the ground by the officers. (Id. 12:47:52–12:48:03). Subsequently, one of the officers removed the object from Birry's sweatpants, which turned out to be a bag containing a handgun, ammunition, and suspected controlled substances. (Id. 12:48:46–12:48:55, 12:49:12–12:49:15, 12:53:46–12:53:56; see also Doc. 47, H.T. 54:12-16 (Shaheen)).

---

[2] The scope of Birry's consent is an issue to be resolved with this motion.

On April 5, 2024, Birry filed the instant motion to suppress relative to the September 11, 2023 search. (Doc. 26). He seeks to preclude all primary and derivative evidence from that search, including the handgun, ammunition, controlled substances, money, and cellphone, along with his post-arrest statements. (Doc. 28, Def. Br. in Supp at 6, n. 2).

The government filed its brief in opposition on June 5, 2024. (Doc. 33). The court held an evidentiary hearing on September 19, 2024, where Pratt and Shaheen testified.[3] (Doc. 47, H.T.). The parties submitted supplemental briefs on October 15, 2024, citing to the hearing transcript. (Docs. 48, 49). Birry's suppression motion is thus ripe for disposition.

**Legal Standard[4]**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)(citing Katz v. United States, 389 U.S. 347, 356–57 (1967)). "Warrantless

---

[3] Birry filed a separate motion to dismiss Counts 6 and 7 of the indictment. (Doc. 24). The court denied that motion on July 25, 2024. (Doc. 40 (memorandum), Doc. 41 (order)).

[4] The legal standard and analysis sections of this memorandum constitute the court's findings of fact and conclusions of law.

searches and seizures are presumptively unreasonable unless the Government

satisfies its burden of establishing that one of the exceptions to the warrant

requirement applies." United States v. Bey, 911 F.3d 139, 145 (3d Cir.

2018)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)).

One "well-established exception to the Fourth Amendment's warrant

requirement permits an officer to 'conduct a brief, investigatory stop when the

officer has a reasonable, articulable suspicion that criminal activity is afoot.' "

United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012) (quoting Illinois v.

Wardlow, 528 U.S. 119, 123 (2000)); see also Terry v. Ohio, 392 U.S. 1, 27, 30–

31 (1968)). "[T]he Terry reasonable suspicion standard applies to routine traffic

stops." United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir.

2006)(discussing Whren v. United States, 517 U.S. 806, 810 (1996); United

States v. Arvizu, 534 U.S. 266, 273 (2002)). Another well-established exception

to the requirements of both a warrant and probable cause is a search that is

conducted pursuant to consent. See Schneckloth v. Bustamonte, 412 U.S. 218,

219 (1973)(citations omitted).

A defendant who seeks to suppress evidence from a claimed Fourth

Amendment violation bears the initial burden of establishing a basis for his

motion. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation

omitted). Once the defendant establishes a basis for his motion, the "burden

shifts to the government to show that the search or seizure was reasonable." Id.;
see also United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009)("the Fourth
Amendment does not prohibit all searches—only those that are unreasonable.")
(additional citation omitted).  The government must then prove by a
preponderance of the evidence that "each individual act constituting a search or
seizure under the Fourth Amendment was reasonable." United States v. Ritter,
416 F.3d 256, 261 (3d Cir. 2005); see also United States v. Matlock, 415 U.S.
164, 178, n. 14 (1974).

"Courts must review reasonableness through an objective lens…and
should not consider the actual or subjective intentions of the officer involved."
United States v. Hunter, 88 F.4th 221, 224 (3d Cir. 2023), cert. denied, 144 S. Ct.
858, 218 L. Ed. 2d 51 (2024)(citing Ohio v. Robinette, 519 U.S. 33, 39 (1996);
Whren, 517 U.S. at 813).  If the government does not meet their burden,
evidence obtained from an unreasonable search must be suppressed as "fruit of
the poisonous tree." United States v. Brown, 448 F.3d 239, 244 (3d Cir.
2006)(quoting Wong Sun v. United States, 371 U.S. 471, 487–88 (1963)(internal
quotations omitted)).

**Analysis**

Three counts of the indictment relate to the handgun and controlled
substances found on Birry's person after the September 11, 2023 traffic stop.

8

Birry raises five arguments in support of suppression of that evidence. His first three arguments are related: (1) the seizure was unreasonable in length; (2) the seizure was unreasonably prolonged by officers' investigation of ordinary criminal wrongdoing in the absence of reasonable suspicion; and (3) the seizure was unreasonable because officers required production of Birry's identification. Birry's final two arguments focus on the later portions of his encounter with the Blakely police: (4) the search was unreasonable because officers exceeded the scope of his consent; and (5) the search was unreasonable because officers lacked reasonable suspicion that he was armed and dangerous.

Birry's first three arguments derive from the holding in Rodriguez v. United States, 575 U.S. 348 (2015) and subsequent jurisprudence from the Third Circuit Court of Appeals. (See Doc. 49, Def. Supp. Br. at 2-13). The court will address these interrelated arguments collectively.

### 1. Length of the Seizure / Request for Identification / Reasonable Suspicion to Prolong the Stop

As Patrolman Pratt searched the driver of the PT Cruiser and secured him in the police vehicle, Birry stuck his head out of the passenger window and asked Corporal Shaheen if he could call a cab. (Doc. 27-1, Pratt Cam 12:44:55–12:45:00; Shaheen Cam 12:44:54–12:44:57). Corporal Shaheen denied that request. (Shaheen Cam 12:44:57). Instead, Shaheen asked Birry for proof of identification. (Id. 12:44:59). Shaheen then ordered Birry out of the PT Cruiser

9

and Pratt questioned Birry about how he knew the driver and where they were headed. (Id. 12:45:38, 12:46:27–12:46:45). Based on the conduct of the officers, Birry argues that the traffic stop was unreasonably extended without reasonable suspicion.

The law provides that a police officer is permitted "to initiate a brief investigative traffic stop when he has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Kansas v. Glover, 589 U.S. 376, 380 (2020)(citing United States v. Cortez, 449 U.S. 411, 417–418 (1981)); Terry, 392 U.S. at 21–22. "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop…and attend to related safety concerns." Rodriguez, 575 U.S. at 354 (citations omitted). "Authority for the seizure [] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018)(citing Rodriguez, 575 U.S. 355–56). "If an extension of a stop prolongs it 'beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation,' the resulting delay must be supported by reasonable suspicion."

United States v. Hurtt, 31 F.4th 152, 159 (3d Cir. 2022)(quoting Rodriguez, 575 U.S. at 350–51).

The inquiry under Rodriguez proceeds in two steps. United States v. Stewart, 92 F.4th 461, 467 (3d Cir. 2024)(citing Hurtt, 31 F.4th at 159).  The first step is identifying the point when a traffic stop is measurably extended, which is referred to as the "Rodriguez moment." Id. (citing Green, 897 F.3d at 179); see also United States v. Garner, 961 F.3d 264, 270-71 (3d Cir. 2020).  At the second step, the court determines "whether the facts available to the officer up to that moment established reasonable suspicion of criminal activity." Id. "The extension of the traffic stop is lawful only if, at the time of the extension, the officer already had reasonable suspicion." Id. (citing Garner, 961 F.3d at 271).

Birry argues that the "Rodriguez moment" occurred when officers first turned their attention to him. (Doc. 36, Def. Reply Br. at 4).  The government argues that Patrolman Pratt and Corporal Shaheen did not extend the stop at all. (Doc. 33, Gov. Br. in Opp. at 10).  Sometimes finding a Rodriguez moment proves difficult. See Green, 897 F.3d at 180.  But, as discussed next, there is a clear moment in this case where the officers measurably extended the traffic stop to investigate other crimes, just not the moment Birry argues it is.

Taking a step back, it is uncontested in this case that the initial stop of the

PT Cruiser was lawful under the Fourth Amendment.[5]  "A seizure for a traffic

violation justifies a police investigation of that violation." Rodriguez, 575 U.S. at

354.  Tasks ordinarily tied to a traffic stop include: 1) checking the driver's

license; 2) determining whether there are outstanding warrants against the driver,

and 3) inspecting the automobile's registration and proof of insurance. Garner,

961 F.3d at 271 (citing Rodriguez, 575 U.S. at 355).  Additionally, "questions

relating to a driver's travel plans ordinarily fall within the scope of the traffic stop,

as do delays caused by safety concerns related to the stop." Id. (citing United

States v. Clark, 902 F.3d 404 (3d Cir. 2018); United States v. Givan, 320 F.3d

452, 459 (3d Cir. 2003)).

At the beginning of the stop, Patrolman Pratt justifiably began investigating

the numerous violations of the Pennsylvania Vehicle Code that gave him grounds

to pull over the PT Cruiser in the first place. (Doc. 27-1, Pratt Cam 12:39:12–

---

[5] A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation. United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004)(citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977)). Here, Birry concedes that Officer Pratt lawfully pulled over the PT Cruiser for violations of Pennsylvania's Vehicle Code, that is, the cracked windshield and the expired registration. Pennsylvania's Vehicle Code makes it unlawful to drive an unregistered vehicle. 75 PA. CONS. STAT. § 1301(a).  Pennsylvania also makes it unlawful to move a vehicle on a public road without a valid certificate of inspection, performed annually for most vehicles. See 75 PA. CONS. STAT. §§ 102, 4702(a), 4703(a). Pursuant to state regulations, a cracked windshield will cause a vehicle to fail a safety inspection if the crack interferes with the driver's vision. See 67 PA. CODE § 175.80(a)(2)(i)(G). Moreover, it is unlawful in Pennsylvania to operate a vehicle on a public road in violation of state transportation regulations or otherwise "in an unsafe condition." 75 PA. CONS. STAT. § 4107(b)(2).

12:39:45).  The driver, Brallier, did not have a drivers' license on his person. (Id. 12:39:45–12:39:53).  Brallier told Pratt that he forgot his wallet. (Id. 12:40:12– 12:40:56).  When Pratt sought to confirm Brallier's identity, he discovered the warrant for Brallier's arrest. (Id. 12:42:05).

As Patrolman Pratt worked through tasks related to Brallier in the patrol car, Birry sat silently in the PT Cruiser. (Shaheen Cam 12:40:11–12:44:27). Corporal Shaheen kept his attention on Brallier as they moved to the sidewalk at the driver's request. (Id. 12:41:23–12:43:36).  Then, Pratt returned to the sidewalk and handcuffed Brallier. (Id. 12:43:36–12:44:27).  As Pratt patted down Brallier, Birry stopped sitting silently. (Id. 12:44:27–12:44:28). He began calling to Corporal Shaheen and motioning out of the passenger side window with his phone, cigarette pack, and wallet in his hands. (Id. 12:44:43–12:44:58). Such conduct drew Corporal Shaheen back toward the vehicle and away from Brallier before Brallier was secured in Pratt's vehicle. (Id.)  As discussed in the next several sections, the actions then taken by the officers were objectively reasonable and did not violate Birry's Fourth Amendment rights.

### a. Reasonable Safety Precautions Related to the Mission of the Traffic Stop

The Fourth Amendment permits the consideration of officer safety when confronting a potentially dangerous situation. Hunter, 88 F.4th at 222.  "Traffic stops are 'especially fraught with danger to police officers,' … so an officer may

need to take certain negligibly burdensome precautions in order to complete his mission safely." Rodriguez, 575 U.S. at 357 (quoting Arizona v. Johnson, 555 U.S. 323, 330, (2009)).  The interest in officer safety stems from the mission of the stop itself. Id. at 356; Clark, 902 F.3d at 410.

Having reviewed both officers' bodycam footage, Corporal Shaheen took three negligibly burdensome precautions to ensure his (and Pratt's) safety: 1) rebuffing Birry's request for a cab and implicitly making Birry stay in the vehicle; 2) procuring Birry's identification for a criminal record check; and 3) eventually asking Birry to step onto the sidewalk. [6]

Birry's requests from the passenger seat drew Shaheen's attention before Pratt's tasks securing Brallier were finished. (Shaheen Cam 12:44:43–12:44:58)). As Patrolman Pratt continued patting down Brallier on the sidewalk, Shaheen denied Birry's requests to call for a cab. (Pratt Cam 12:44:55–12:45:00; Shaheen Cam 12:44:56–12:44:58).  At that juncture, Birry remained in the passenger seat and Shaheen had the authority to keep Birry seated there without violating his Fourth Amendment rights.  A police officer executing such a lawful stop "may exercise reasonable superintendence over the car and its passengers[,]" such as

---

[6] Additionally, the traffic stop occurred on State Route 347 where the boroughs of Blakely, Olyphant, and Dickson City all converge in a commercial area.  Accordingly, the officers encountered members of the public passing the scene in their own vehicles and at least one pedestrian walking past them on the sidewalk as they went to speak to Birry. (See e.g. Pratt Cam 12:45:36).

ordering occupants of a vehicle to remain in the car with their hands up. Bonner, 363 F.3d at 216 (citing United States v. Moorefield, 111 F.3d 10 (3d Cir. 1997)). Telling Birry "we'll figure it out" after Birry asked to call a cab was a negligibly burdensome safety precaution taken by Corporal Shaheen as Patrolman Pratt completed his tasks with Brallier.  Essentially, Shaheen gave Birry an answer in a manner strongly suggesting that Birry stay in the car.

Prior to being asked to step out of the vehicle, Birry also produced his state-issued identification card to Corporal Shaheen as both officers requested. (Pratt Cam 12:45:00; Shaheen Cam 12:44:58–12:44:59).  Shaheen radioed in Birry's information to a communications center to presumably check for warrants, parole status, and/or criminal history. (Shaheen Cam 12:45:15, 12:45:31–12:45:52).    Separately, Birry argues that this request for identification supports suppression of the evidence. (Doc. 28, Def. Br. in Supp. at 11-12).  Under the circumstances however, checking Birry's identification for a criminal history inquiry was objectively reasonable and an appropriate officer safety precaution. See Hunter, 88 F.4th at 224 (holding that a criminal record check lasting approximately two minutes can be an objectively reasonable safety precaution

related to the mission of the traffic stop under Rodriguez and the Fourth Amendment). [7]

The facts here fit within the scope of a negligible officer safety precaution. From an objective standpoint, the PT Cruiser could not be driven from the scene. The police had not yet confirmed Brallier's warrant search results or started addressing the citations related to Brallier's summary offenses. Even if Shaheen ultimately granted Birry's request to call for a ride, Birry would have had to stay near the officers for an additional period of time. As for the length of time needed to conduct a criminal record check on Birry, that issue is moot. Two minutes later, Birry was in handcuffs.

Corporal Shaheen radioed in Birry's information as Birry slowly complied with Shaheen's directive to step out of the vehicle. (Shaheen Cam, 12:45:30–12:45:54). Ordering Birry out of the car was also a negligibly burdensome safety precaution after Brallier had been secured in Pratt's patrol car. Under the law, officers can order the driver and any passengers out of a vehicle without any particularized suspicion. Bonner, 363 F.3d at 216 (citing Mimms, 434 U.S. at 109;

---

[7] In Hunter, the Third Circuit Court of Appeals joined six other circuits in concluding that a criminal history check "is permissible and within the bounds of the Fourth Amendment[]" when necessary to complete the mission of the traffic stop safely. 88 F.4th at 224 & n. 8 (collecting cases). As referenced in Hunter, the Tenth Circuit has explicitly held that "an officer's decision to run a criminal-history check on an occupant of a vehicle after initiating a traffic stop is justifiable as a 'negligibly burdensome precaution' consistent with the important governmental interest in officer safety." Id. (quoting United States v. Mayville, 955 F.3d 825, 830 (10th Cir. 2020)(further citation omitted)).

16

Maryland v. Wilson, 519 U.S. 408 (1997)); see also Hunter, 88 F.4th at 227, n. 3

(McKee, J., concurring op.)(citations omitted).  As indicated above, Birry could

not remain with the vehicle.  Until issues relative to the driver and the vehicle

were sorted out, Birry's continued presence in the PT Cruiser also posed an

issue to the officers' safety as they remained on scene. See Wilson, 519 U.S. at

417 ("Outside the car, the passengers will be denied access to any possible

weapon that might be concealed in the interior of the passenger compartment.").

Under the circumstances, Corporal Shaheen's directive to Birry to step out of the

vehicle was reasonable and did not violate Birry's Fourth Amendment rights.

### b. Reasonable Suspicion to Ask Birry Three Questions

Next, Patrolman Pratt asked Birry three questions while Corporal

Shaheen observed Birry's hand motions: 1) "How do you know this guy?" 2) "Do

you know him, like or…?" and 3) "Where's he giving you a ride from?" (Pratt Cam

12:46:30–12:46:44).[8]  These questions, along with Birry's responses, added

twenty seconds to the encounter. (Id.)  But Pratt's first question to Birry diverted

from the mission of the traffic stop to an investigation of other criminal activity by

Brallier, Birry, or both.  On cross-examination at the suppression hearing, Pratt

---

[8] Pratt's fourth question, "Ok, you're going back to Wilkes-Barre?", went unanswered, as Birry had turned to Corporal Shaheen and asked if he could put his hands back into his jacket pockets. (Doc. 27-1, Pratt Cam 12:46:47-12:46:49, Shaheen Cam 12:46:45-12:46:47).  This prompted Shaheen's requests to search Birry as discussed in section 2.

agreed that the purpose of these questions was to see if Birry's answers would

be consistent or inconsistent with Brallier's earlier answers to similar questions.

(Doc. 47, H.T. at 31:8-24).  Contrary to both parties' assertions in their briefs, this

is the definitive "Rodriguez moment." See e.g. Stewart, 92 F.4th at 467 (citing

Green, 897 F.3d at 179).

At this juncture, the court must consider whether the officers already had

reasonable suspicion to probe into matters unrelated to the traffic stop.  Id. (citing

Garner, 961 F.3d at 271); see also Lewis, 672 F.3d at 237 ("an officer who

develops a reasonable, articulable suspicion of criminal activity may expand the

scope of an inquiry beyond the reason for the stop and detain the vehicle and its

occupants for further investigation.").  Courts making reasonable suspicion

determinations must examine the totality of the circumstances of each case to

analyze whether the detaining officer has a particularized and objective basis for

suspecting legal wrongdoing.  Arvizu, 534 U.S. at 273 (citing Cortez, 449 U.S. at

417–418). The court "consider[s] 'whether a reasonable, trained officer standing

in the officer's shoes could articulate specific reasons justifying' the extension of

the stop." Stewart, 92 F.4th at 468 (quoting United States v. McCants, 952 F.3d

416, 422 (3d Cir. 2020)).

Moreover, "[a]lthough a mere 'hunch' does not create reasonable

suspicion, the level of suspicion the standard requires is considerably less than

proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Glover, 589 U.S. at 380 (citing Navarette v. California, 572 U.S. 393, 397 (2014); United States v. Sokolow, 490 U.S. 1, 7 (1989)). The reasonable suspicion standard: 1) is "less demanding" and "less stringent" than probable cause; 2) allows for an inquiry that "falls considerably short of 51% accuracy[;]" 3) rejects "a rigid structure on the concept of reasonableness[;]" and 4) can be based on an officer's common sense as a source of evidence with or without any specialized training or extensive experience  See id. at 380–84 (citations omitted). The reasonable suspicion standard is thus "relatively deferential to the detaining officer." Stewart, 92 F.4th at 467.

Looking at the whole picture, Patrolman Pratt had reasonable suspicion to begin asking Birry questions outside of the PT Cruiser about how he knew the driver and where they were coming from.  First, Pratt observed suspicious things about the vehicle, a PT Cruiser with a cracked windshield.[9] (Doc. 47, H.T., 8:25–9:4).  Moreover, that PT Cruiser had not been registered (or inspected) in six

---

[9] From the vantagepoint of Shaheen's bodycam video, the crack ran from under the middle of the drivers' side windshield wiper up and diagonally across the entire passenger side of the windshield. (Doc. 27-1, Shaheen Cam 12:39:36).

years.[10] (See id. 9:5-8, 16:5-16, 36:15-16).  Brallier did not have a drivers' license in his possession. (Id. 12:19-23). The vehicle was not insured. (Id. 16:5-16).

Brallier struggled to tell Pratt about his travel plans, including his connection to Birry: "a guy…my dad's friend. I give him a ride."[11] (Doc. 27-1, Pratt Cam 12:40:31–12:40:56). Pratt then asked, "do you know his name?" and Brallier responded, "I think his name's Chris." (Id. 12:40:56–12:40:59).  Subsequently, Pratt discovered that Brallier appeared to have an active warrant. (Id.).

Birry's conduct also caught both officers' attention.  After being ordered out of the car, Birry needed a full forty (40) seconds to gather his wallet and phone, stand up from the car, and close the door. (Id. 12:45:41–12:46:25).  Per Pratt's testimony at the suppression hearing, Birry's slow exit was atypical. (Doc. 47 H.T. 17:18-21).  As Birry stood up from the vehicle, he continued to shuffle items in his hands, pat around the bottom of his unzipped jacket, and check the waistband of his sweatpants as Pratt began asking questions. (Doc. 27-1, Pratt Cam 12:46:18–12:46:30).  According to Pratt, Birry appeared nervous. (Doc. 47,

---

[10] In candor, Pratt stated to Shaheen on his bodycam video: "Well, they drove past me and I'm like, 'they look sketchy, let me run the tag.' It expired 2017. I'm like, 'that can't be right.' So I go to catch up and I'm like, 'ooh, that *is* right…' " (Doc. 27-1, Pratt Cam 13:07:38-13:07:46). Pratt was not cross-examined on these statements during the suppression hearing.  Nonetheless, "any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) (citing Whren, 517 U.S. 806).

[11] "[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." Givan, 320 F.3d at 459 (citation omitted).

H.T. 17:22-25). Pratt also noted that Birry was "fiddling" with some of his items as he exited the vehicle. Id.  Shaheen testified that Birry took "a lot longer than people usually do to get out of the vehicle." (Id. 49:14-18).

"[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Wardlow, 528 U.S. at 125 (citing Cortez, 449 U.S. at 418). And "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Id. at 124.  Consequently, looking at all the circumstances up to that point, Pratt had more than a hunch; he had reasonable suspicion to extend the stop and ask Birry questions about how he knew Brallier and what their travel plans were.  Pratt had reasonable suspicion to believe that either Brallier, Birry, or both were involved in other criminal activity and his questions did not violate Birry's Fourth Amendment rights.

## 2. Birry's Consent to a Search

As Patrolman Pratt asked Birry the above questions, the defendant continued to juggle his wallet and phone and move these objects in the direction of his jacket pockets. (Pratt Cam 12:46:44–12:46:49; Shaheen Cam 12:46:41–12:46:46).  Corporal Shaheen asked to search Birry and Birry consented. (Shaheen Cam 12:46:53–12:47:00).  Birry argues that the search exceeded his consent, that is, he only consented to a search of his jacket pockets. (Doc. 49,

Def. Supp. Br. at 13–14).  The government counters that Birry did not limit his consent or withdraw it at any time as Shaheen moved on from a search of Birry's jacket pockets.  (Doc. 48. Gov. Supp. Br. at 10–12).

"The Supreme Court has 'long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.' " Price, 558 F.3d at 277 (quoting Florida v. Jimeno, 500 U.S. 248, 250–51 (1991)).  A warrantless search is lawful when done pursuant to valid, voluntary consent. Schneckloth, 412 U.S. at 222.  The government retains the burden of proving that consent was freely and voluntarily given; however, this burden is not satisfied by showing a mere submission to a claim to lawful authority. See Price, 558 F.3d at 277–78 (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Florida v. Royer, 460 U.S. 491, 497 (1983)).  "[V]oluntariness 'is a question of fact to be determined from the totality of all of the circumstances.' " Givan, 320 F.3d at 459 (quoting Schneckloth, 412 U.S. at 227).

Additionally, "a person may 'delimit as he chooses the scope of the search to which he consents.' " United States v. Williams, 898 F.3d 323, 329 (3d Cir. 2018)(quoting Jimeno, 500 U.S. at 252).  "[T]he standard for measuring the limitations placed on a consensual search "is that of objective reasonableness[,]'" and a determination of the legal bounds of a consensual search comes down to

"'what…the typical reasonable person [would] have understood by the exchange between the officer and the suspect.' " Id. (quoting Jimeno, 500 U.S. at 251).

The bodycam videos show that Birry did not limit his consent to a search of his jacket pockets.  As he answered Pratt's question about whether he knew Brallier, Birry placed his right hand into his right jacket pocket. (Doc. 27-1, Pratt Cam 12:46:36). Shaheen's bodycam captured Birry moving his right hand around in his jacket pocket. (Shaheen Cam 12:46:33–12:46:39).  At that point, Shaheen directed Birry to keep his hands out of his pockets. (Id. 12:46:39).  Birry apologized and momentarily complied with Shaheen's command.  (Id. 12:46:39–12:46:45).  But then Birry began to gesture his phone and wallet back to his pockets with his hands. (Id. 12:46:45–12:46:47). The following exchange occurred:

> **Birry** (looking at Shaheen)**:** Can I put them back in?
>
> **Shaheen** (raising his arms up with his palms facing Birry)**:** Bud, do you have, do you have anything in your pockets?
>
> **Birry** (averting eye contact)**:** Uh…I might. Here, you can, you want to check it?

(Pratt Cam 12:46:47–12:46:52; Shaheen Cam 12:46:44–12:46:49).

At this juncture, Birry lifted his jacket pockets with the fingers of both hands and offered them to Shaheen. (Pratt Cam 12:46:50–12:46:53).  The exchange continued:

23

**Shaheen:** You might?

**Birry:** I have like uh—

**Shaheen:** Just keep your hands up. *(Birry drops his jacket pockets and puts his hands up).*

Do you have anything in your pockets that I should know about?

**Birry:** My headph – no nothing like – headphones and cigarettes.

**Shaheen** *(placing the palms of hands down and then opening his hands while expanding his arms wider):* Oh? Can I search you?

**Pratt:** Anything illegal on you?

**Birry** *(pulling open the right side of his unzipped jacket)***:** No, no.

**Shaheen:** Can I, can I search you?

**Birry** *(pulling his jacket open again)***:** I mean…yeah, I mean, I don't have anything on me.

*(Birry steps toward Shaheen with his arms extended and Shaheen begins searching Birry's right jacket pocket)*

**Shaheen:** OK, I'm just asking, bud. Then I'll let you put your hands back in your pockets.

**Pratt:** Then we can relax if you know what I mean.

**Birry:** Yeah.

(Pratt Cam 12:46:52–12:47:07; Shaheen Cam 12:46:49–12:47:05).

As Corporal Shaheen testified, he asked (twice), "can I search *you*?" not "can I search your pockets?" (Doc. 47, H.T. 51:2-5).  As indicated above, Patrolman Pratt also asked, "do you have anything illegal *on you*?" to which Birry replied "no, no."  Birry's affirmative response to Shaheen's second request to search indicated that Birry knew the request was for a search of his entire person, not just his jacket pockets, as he stated, "I don't have anything *on me*." Additionally, at two points during this portion of the encounter, Birry pulled open his jacket to expose the right side of his upper body, which would otherwise be covered by the jacket.

While the above exchange began with concerns about Birry reaching into his jacket pockets, it is clear that Birry: 1) understood that Shaheen was requesting to search his entire person; and then 2) made an affirmative, non-limiting statement with accompanying body language offering up more than his pockets for a search.  The totality of these circumstances reflects that Birry freely and voluntarily gave officers consent to search his entire person.  A typically reasonable person would understand that such consent was not limited by Birry in any manner.

Birry also argues that he limited his consent or withdrew his consent because Shaheen directed the defendant to stop moving around during the search.

After the exchange discussed above, Corporal Shaheen searched Birry's right jacket pocket. (Doc. 27-1, <u>Pratt Cam</u>, 12:47:02).  He removed wireless headphones and a cigarette pack. (<u>Id.</u> 12:47:06).  Shaheen searched the contents of the cigarette pack then handed the headphone and cigarettes to Pratt. (<u>Id.</u> 12:47:06–12:47:19).  After feeling around the right side of Birry's jacket for an additional moment, Shaheen reached into Birry's left jacket pocket and removed a pair of lacy underwear and promptly placed the garment back in Birry's jacket. (<u>Id.</u> 12:47:19–12:47:28). Birry stated, "That's just underwear," and Shaheen responded, "Yeah, sure is." (<u>Shaheen Cam</u> 12:47:25).

After that split second of levity, Shaheen felt along both sides of Birry's jacket and then told him to turn around. (<u>Pratt Cam</u> 12:47:30–12:47:35).  Birry turned away from the corner of the brick building where Shaheen had started the search. (<u>Id.</u> 12:47:35–12:47:37). Birry turned in several steps to move underneath a billboard in the adjoining service station parking lot. (<u>Id.</u>)  Shaheen lifted the back of Birry's jacket. (<u>Id.</u> 12:47:38).  Shaheen also asked, "do you have anything in your waistband?" (<u>Id.</u>)  Birry, facing away from Shaheen, but in the view of both officers, reached toward his waistband. (<u>Pratt Cam</u> 12:47:38–12:47:40); <u>Shaheen Cam</u> 12:47:36–12:47:37). Shaheen responded to Birry's movements toward his waistband by muttering "just keep..." (<u>Shaheen Cam</u> 12:47:36–12:47:37).  Then Shaheen grabbed at the sides of Birry's sweatpants

26

and tugged them up and down. (Pratt Cam 12:47:39–12:47:40). While tugging, Shaheen told Birry, "stop moving around." (Id. 12:47:41).

Birry argues that Shaheen's command at that moment is evidence that Birry limited his consent. (Doc. 28, Def. Br. in Supp. at 13). Birry's movements, however, were coupled with silence. Moreover, at the moment Shaheen began to tell Birry to stop moving around, Birry was reaching toward the waistband of his sweatpants. (Pratt Cam 12:47:39–40; Shaheen Cam 12:47:37–38). A typically reasonable person would not reach the conclusion that Birry limited his consent in any manner at this time. Thus, the ongoing search was reasonable.

### 3. Whether The Officers Had Reasonable Suspicion That Birry Was Armed and Dangerous During the Consent Search

The above facts also blend into Birry's final argument. Birry argues (in the alternative) that the latest the search of Birry's person was consensual was when Shaheen told Birry to put his hands up against a brick wall. (Doc. 28, Def. Br. in Supp. at 13). The court disagrees.

Birry never objectively withdrew his consent, even when Shaheen asked Birry to turn around and began tugging at the sides of Birry's sweatpants. "Once it has been established that a suspect has voluntarily consented to a search, it is his burden to demonstrate that he has withdrawn that consent by pointing to an act or statement that an objective viewer would understand as an expression of his desire to no longer be searched." Williams, 898 F.3d at 331. The only act or

statement from Birry suggestive of his withdrawal of consent was his later attempt to flee the scene.

Furthermore, Birry takes the position that, when Corporal Shaheen ordered Birry to the wall, Shaheen was requiring the defendant to submit to a pat down, frisk, or other search without reasonable suspicion. (Doc. 28, Def. Br. in Supp. at 14).  The court addresses this argument for the sake of completeness.

The law permits officers conducting routine traffic stops to perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous. Johnson, 555 U.S. at 332 (citation omitted).

At the point Corporal Shaheen ordered Birry to place his hands against the wall, Shaheen had already observed an unidentifiable object drop in Birry's pant leg, per his testimony at the suppression hearing. (Doc. 47, H.T. 52:13-22). Shaheen's bodycam video depicts him tapping that object after the quick shake of Birry's pants and before he told Birry to put his hands against the wall. (Doc. 27-1, Shaheen Cam 12:47:38–12:40:41).  Just prior to that moment, Birry moved his right hand toward his waistband as Shaheen placed his hands onto the sides of Birry's pants.  (Pratt Cam 12:47:39–12:47:40; Shaheen Cam 12:47:36).   Per Pratt's testimony at the suppression hearing, Birry was "blading" his body away from the area that Shaheen was trying to search and was moving around.  (Doc. 47, H.T. 20:9-17).  Shaheen similarly testified that Birry was overly nervous and

kept trying to "blade" his body away from the search. (Id. 51:25-52:4).  Both officers also testified and explained that Birry's conduct aligned with their recent training where they were taught blading is when a suspect angles their body to move objects away from officers. (Id. 19:21-20:3 (Pratt); 51:25-52:4 (Shaheen)).

At that time, Birry held his wallet and his cellphone in his hands. Pratt was also in the possession of Birry's wireless headphones and cigarette pack.  Taking the whole picture into consideration, at the time Shaheen noticed the object that dropped in Birry's pantleg during the consensual search, he also had reasonable suspicion to believe that Birry may be armed and dangerous.  Objectively, there was a high probability in that moment that the object in Birry's sweatpants was a firearm.  Thus, the officers did not violate the defendant's Fourth Amendment rights as they also had reasonable suspicion to believe that Birry was armed and dangerous at the moment Shaheen ordered Birry to put his hands against the wall during the search conducted pursuant to Birry's consent.  Accordingly, Birry's motion to suppress will be denied.

**Conclusion**

For the reasons set forth above, the defendant's motion to suppress (Doc. 26) will be denied and this matter will be set for trial by an appropriate order.

Date: 11/4/24

_____
JUDGE JULIA K. MUNLEY
United States District Court